CLERK'S OFFICE
A TRUE COPY
Jul 07, 2025
s/ JDH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
289 E HURON STREET APT 1000, BERLIN, WISCONSIN

Case No. 25-M-427 (SCD)

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the Eastern District of Wisconsin *(identify the person or describe the property to be searched and give its location)*:

See Attachments A-1 and B

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before July 17, 2025 *(not to exceed 14 days)*

☑ in the daytime 6:00 a.m. to 10:00 p.m. ❒ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to the magistrate judge on duty.
*(United States Magistrate Judge)*

❒ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❒ for ____ days *(not to exceed 30)* ❒ until, the facts justifying, the later specific date of ____________.

Date and time issued: 7-7-25, 7:40 a.m.

Stephen C. Dries
*Judge's signature*

City and state: Milwaukee, Wi

U.S. Magistrate Judge Stephen Dries
*Printed name and title*

**Return**

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: ________________

*Executing officer's signature*

*Printed name and title*

**ATTACHMENT A-1**

**Property to Be Searched**

This warrant applies to the residence located at 289 E Huron Street, Apt 1000, Berlin, Wisconsin (the SUBJECT PREMISES). THE SUBJECT PREMISES is a three story, brick, apartment building with a white entrance known as Historic Berlin School Apartments.



**ATTACHMENT B**
**Property to be seized**

1. Evidence, instrumentalities, and fruits, whether in electronic or physical format, concerning violations of 18 U.S.C. § 1956 (money laundering), 18 U.S.C. § 371 (conspiracy), 18 U.S.C. § 1030 (computer fraud), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1349 (conspiracy to commit wire fraud), and 18 U.S.C. § 1028A (aggravated identity theft) (collectively, the "SUBJECT OFFENSES"), involving TREYTON DANIEL AUBUCHON, MICAHILA MONZON ("MONZON"), (collectively, the "SUBJECT PERSONS"), and other persons known and unknown, including:

a. Records, information, and evidence relating to the identification of persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the SUBJECT OFFENSES; or (ii) communicated about matters relating to the SUBJECT OFFENSES, including records that help reveal their whereabouts;

b. Records, information, and evidence of all communications, including call logs, text messages, encrypted messaging applications, audio messages, voice mails, as well as any messages in any internet messaging applications (i.e., "apps"), relating to planning, collaborating, conspiring, assisting (knowingly or unknowingly), executing, concealing, or covering up the commission of the SUBJECT OFFENSES, including records that help reveal their whereabouts;

c. Records, information, and evidence of any conspiracy, planning, or preparation to commit the SUBJECT OFFENSES;

d. Records, information, and evidence concerning the creation or use of email addresses, VOIP or Google voice numbers, and encrypted messaging applications related to the SUBJECT OFFENSES:

e. Records, information, and evidence concerning the identification and targeting of victims of the SUBJECT OFFENSES;

f. Records, information, communication, and evidence concerning the phishing, hacking, or taking over of accounts, including developing social engineering methods and practices for obtaining social media account credentials from a victim;

g. Records, information, communications, and evidence concerning the unauthorized access of, intrusion into, or compromise any victim social media account, including data obtained from a victim account without authorization;

h. Records, information, communications, and evidence concerning the unauthorized access of, intrusion into, or compromise, or data obtained from any account belonging to a person other than the SUBJECT PERSONS;

i. Records, information, communications, and evidence concerning access to login credentials for accounts, including communications about purported suspicious login attempts, security codes, passwords, or PINs;

j. Records, information, and evidence the transportation, transmission, or transfer of funds that are intended to be used to promote, conceal, or support unlawful activity relating to the SUBJECT OFFENSES and/or business email compromise schemes

k. Records, information, and evidence concerning any financial transactions and/or financial accounts, including but not limited banking and financial records, ledgers, wire transfer records, bank statements, cancelled checks, deposit slips, check registers, money orders, cashier's checks, account statements, including virtual currency transactions;

l. Records, information, communications, evidence, and electronic storage media concerning to any virtual currency, including information about virtual accounts, wallets, passcodes, private keys, public keys, account opening documents, statements, transactions, and correspondence;

m. Records, information, communications, and evidence concerning phishing panels, phishing calls or texts, or spoofed domains;

n. Documents, files, chats, keys, cryptocurrency symbols, and all records related to the usage, purchase, trading, and sale of cryptocurrency;

o. Driver's Licenses, social security cards, and any other identification documents or documents used for identification or to establish online accounts;

p. Photographs and videos relevant to the SUBJECT OFFENSES;

q. Physical and electronic documentation related to financial transactions, and operations, communication, interaction, or any such documentation that establishes the relationship among individuals active in the The Com or CryptoChameleon;

r. Evidence relating to what transpired at in-person meetings or telephone calls, including audio or video recordings of such meetings or calls and notes and summaries of such meetings or calls relating to the SUBJECT OFFENSES;

s. Evidence or records relating to the identification of any mail or Internet accounts, cryptocurrency accounts, bank accounts, telephone numbers, social media services, or web or mobile based applications providing Internet access, remote data storage, or communication services for any coconspirators;

t. The sources of income, and the location of, and identifiers for, bank accounts, virtual currency accounts, credit accounts, or other financial accounts relating to the SUBJECT OFFENSES;

u. Records, information, and evidence concerning to any digital payment processing company, such as PayPal, Venmo, Google Pay, or Apple Cash, including account opening documents, statements, and correspondence;

v. Records, information, communications, and evidence concerning creating, drafting, requesting, sending or receiving fraudulent documents, photographs, videos, or files used to further the SUBJECT OFFENSES;

w. Records and information relating to the use of other tools and techniques related to anonymizing online activities and avoiding detection or investigation by law enforcement, including the use of proxy services, virtual private network services, or of multiple online aliases and accounts;

x. Items relating to the use of cryptocurrency, including:

   i. Any and all representations of cryptocurrency public keys or addresses;

   ii. Any and all representations of cryptocurrency private keys;

   iii. Any and all representations of cryptocurrency wallets or their constitutive parts, to include "recovery seeds" or "root keys" which may be used to regenerate a wallet;

   iv. any and all software programs relating to the obtaining, use, and transacting in cryptocurrency;

   v. any and all communications or other records concerning the obtaining, use, and disposition of cryptocurrency;

   vi. Cryptocurrency hardware wallets or devices, such as Trezors.

2. For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry

entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c. evidence of the lack of such malicious software;

d. evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e. evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h. evidence of the times the COMPUTER was used;

i. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k. records of or information about Internet Protocol addresses used by the COMPUTER;

l. records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m. contextual information necessary to understand the evidence described in this attachment.

3. Routers, modems, and network equipment used to connect computers to the Internet.

The term "COMPUTER" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, cryptocurrency wallets, USBs, and other magnetic or optical media

During the execution of the search described in Attachment A-1 and A-2 law enforcement personnel are also specifically authorized to obtain from MONZON (but not any other individuals present at the time of execution of the warrant) the compelled display of any physical biometric characteristics (such as fingerprint/thumbprint, facial characteristics, or iris display) necessary to unlock any digital devices requiring such biometric access subject to seizure pursuant to this warrant for which law enforcement has reasonable suspicion that MONZON's physical biometric characteristics will unlock, to include pressing fingers or thumbs against and/or putting a face before the sensor, or any other security feature requiring biometric recognition of for the purpose of attempting to unlock the devices' security features in order to search the contents as authorized by this warrant.

While attempting to unlock the device by use of the compelled display of biometric characteristics pursuant to this warrant, law enforcement is not authorized to demand that the aforementioned person(s) state or otherwise provide the password or identify the specific biometric characteristics (including the unique finger(s) or other physical features), that may be used to unlock or access the devices. Nor does the warrant authorize law enforcement to use the fact that the warrant allows law enforcement to obtain the

display of any biometric characteristics to compel the aforementioned person(s) to state or otherwise provide that information. However, the voluntary disclosure of such information by the aforementioned person(s) is permitted. To avoid confusion on that point, if agents in executing the warrant ask MONZON for the password to the devices, or to identify which biometric characteristic (including the unique finger(s) or other physical features) unlocks the devices, the agents will not state or otherwise imply that the warrant requires MONZON to provide such information, and will make clear that providing any such information is voluntary and that MONZON is free to refuse the request.

CLERK'S OFFICE
A TRUE COPY
Jul 07, 2025
s/ JDH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

289 E HURON STREET APT 1000, BERLIN, WISCONSIN

Case No. 25-M-427 (SCD)

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

289 E HURON STREET APT 1000, BERLIN, WISCONSIN; see Attachment A-1

located in the Eastern District of Wisconsin, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. Sections 1956, 371, 1030, 1343, 1349, 1028A | money laundering, conspiracy, computer fraud, wire fraud, conspiracy to commit wire fraud, aggravated identity theft |

The application is based on these facts:

see Affidavit

- ☐ Continued on the attached sheet.
- ☐ Delayed notice of ____ days *(give exact ending date if more than 30 days:* ________ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

[signature]
*Applicant's signature*

Fred Pitts, Special Agent, Federal Bureau of Investigation
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone *(specify reliable electronic means)*.

Date: 7-7-25

Stephen C. Dries
*Judge's signature*

City and state: Milwaukee, Wi

U.S. Magistrate Judge, Stephen Dries
*Printed name and title*

CLERK'S OFFICE
A TRUE COPY
Jul 07, 2025
s/ JDH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF: (1) 289 E HURON STREET APT 1000, BERLIN, WISCONSIN; AND (2) THE PERSON OF MICAHILA MARIE MONZON** | Case No. 25-M-427 (SCD)<br><br>**Filed Under Seal** |

**AFFIDAVIT OF SPECIAL AGENT FRED PITTS**
**IN SUPPORT OF APPLICATION FOR SEARCH WARRANT**

I, Special Agent Fred Pitts, being duly sworn, hereby state the following:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as 289 E Huron Street, Apt 1000, Berlin, Wisconsin (the "**SUBJECT PREMISES**"); and the person of Micahila Marie Monzon ("**MONZON**"), as further described in Attachments A-1 and A-2 for the things described in Attachment B.

2. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since August 2023. Beyond my work experience, I also have received extensive formal training in investigative techniques at the FBI Academy in Quantico, Virginia, and cyber-specific training at the FBI's facility in Huntsville, Alabama. I am currently assigned to the Cyber Crimes Squad in the FBI's Richmond Division. I am responsible for investigations involving computer system intrusions and internet fraud. I have participated in the execution of warrants involving both cyber and drug crimes. Based on my training and experience, I am familiar with the means by which individuals use computers and information networks to commit these and other crimes. I am a law enforcement officer of the United States within the meaning of 18 U.S.C.

§ 2510(7), and I am accordingly empowered by law to conduct investigations and to make arrests for federal felony offenses. I am also a federal law enforcement officer within the meaning of Fed. R. Crim. P. 41(a)(2)(C), that is, a government agent authorized to enforce criminal laws and duly authorized by the Attorney General to request search warrants.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. Unless specifically indicated, all conversations and statements described in this affidavit are related in substance and in part. Where I assert that an event took place on a particular date or at a particular time, I am asserting that it took place on or about the date or at or near the time asserted. Similarly, where I assert that an event took place a certain number of times, I am asserting that the event took place approximately the number of times asserted. Likewise, when I assert that a transaction involved a certain amount of money, I am asserting it involved approximately that amount of money.

4. Based on the facts set forth in this affidavit, there is probable cause to believe violations of 18 U.S.C. § 1956 (money laundering), 18 U.S.C. § 371 (conspiracy), 18 U.S.C. § 1030 (computer fraud), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1349 (conspiracy to commit wire fraud), and 18 U.S.C. § 1028A (aggravated identity theft) (collectively, the "**SUBJECT OFFENSES**") have been committed by **AUBUCHON, MONZON,** and other persons known and unknown. There is probable cause to search the **SUBJECT PREMISES** and **MONZON**, as further described in Attachments A-1 and A-2, for evidence of these crimes as further described in Attachment B.

## DEFINITIONS

5. Bitcoin is a type of virtual currency, circulated over the internet as a form of value. Bitcoin are not issued by any government, bank, or company, but rather are generated and controlled through computer software operating via a decentralized, peer-to-peer network. While bitcoin exist primarily as an Internet-based form of currency, it is possible to "print out" the necessary information and exchange bitcoin via physical medium. Bitcoin is one of many varieties of virtual currency.

6. Bitcoin are sent to and received from Bitcoin "addresses." A Bitcoin address is somewhat analogous to a bank account number and is represented as a 26-to-35-character-long case-sensitive string of letters and numbers. Each Bitcoin address is controlled with a unique corresponding private key, a cryptographic equivalent of a password or pin needed to access the address. Only the holder of an address' private key can authorize any transfers of bitcoin from that address to other Bitcoin addresses.

7. To acquire bitcoin, a typical user will purchase them from a Bitcoin "exchanger."[1] Bitcoin exchangers generally accept payments of fiat currency (currency, such as the United States dollar, that derives its value from government regulation or law) or virtual currencies. When a user wishes to purchase bitcoin from an exchanger, the user will typically send payment in the form of fiat currency, often via bank wire or ACH, or other convertible virtual currency to an exchanger, for the corresponding quantity of bitcoin, based on a fluctuating exchange rate. The exchanger, usually for a commission, will then either sell the user bitcoin from the exchange's reserves or will

[1] It is also possible to earn bitcoin by verifying other users' transactions, a process known as "mining."

attempt to broker the purchase with another user who is trying to sell bitcoin. Similar to a bank, some exchanges require subscriber or "know your customer" information from their account holders. The purchased bitcoin are then transferred to the purchaser's Bitcoin address, allowing the user to conduct transactions with other Bitcoin users via the Internet.

8. Little to no personally identifiable information about the payer or payee is transmitted in a Bitcoin transaction. Bitcoin transactions occur using a public key and a private key. A public key is used to receive bitcoins and a private key is used to allow withdrawals from a Bitcoin address. Only the Bitcoin address of the receiving party and the sender's private key are needed to complete the transaction, which by themselves rarely reflect any identifying information.

9. All Bitcoin transactions are recorded on what is known as the blockchain. This is essentially a distributed public ledger that keeps track of all Bitcoin transactions, incoming and outgoing, and updates approximately six times per hour. The blockchain records every Bitcoin address that has ever received a bitcoin and maintains records of every transaction and all the known balances for each Bitcoin address.

10. A cluster is defined as a group of addresses controlled by one entity. Clustering is a method that helps to deanonymize blockchain data. It links together several wallets that belong to the same user or entity through analysis techniques including co-spending and change addresses. Co-spending is when a number of bitcoin addresses are all used to send bitcoins in a single transaction, which indicates that a single owner holds the private keys for all those addresses. For example, if addresses A and B are co-spent in one transaction, and addresses B and C are co-spent in a second transaction, all addresses A, B and C will belong to the same owner. Change address analysis identifies addresses operating as change addresses for a particular wallet, where all

addresses are controlled by the same owner. When an address spends bitcoin, it must be spent in its entirety. Sometimes the value of the transaction is higher than what the owner wishes to pay. In this case, the wallet generates a new Bitcoin address for which the owner also holds the private key and sends the difference back to this address. This is known as change. Change addresses are therefore highly likely held by the same owner as the original Bitcoin address.

11. A seed phrase is a sequence of random words that stores the data required to access or recover cryptocurrency. Seed phrases are usually generated by cryptocurrency wallets and can be used to recover the contents of the wallet (including virtual currency addresses and private keys). Anyone who possesses the seed phrase can reconstitute the wallet and see and manipulate its contents, including moving them to new addresses.

12. A phishing panel is a tool that cybercriminals use to run phishing attacks and collect data from victims. Phishing panels are hosted on the criminal's infrastructure. A phishing panel typically has two parts: a phishing page and an admin panel. The phishing page is what the victim sees, and is designed to look like a legitimate website, such as a cryptocurrency exchange platform login page. The admin panel is only accessible to the criminal actor, and it allows them to monitor the phishing attack and take actions. When a victim enters their information into the phishing page, the criminal receives and can view the sensitive information, such as a password entered by a victim, on the admin panel.

13. Internet Protocol ("IP") address is a unique string of characters that identifies each computer using the Internet Protocol to communicate over a network.

14. Telegram Messenger Inc. ("Telegram") is a free online platform offering a number of services, including instant messaging ("IM") and voice-over-IP ("VoIP") services that allow

users to send text and voice messages, make voice and video calls, and share images, documents, and other content using secure end-to-end encryption. Telegram also has social networking features, allowing users to post stories and create large public groups with up to 200,000 members. Users can find and join Telegram groups for a variety of topics by either clicking on an invitation link sent to them or by seeking out and joining a specific group. Telegram users are assigned a unique user ID ("UID") that is specific to them and cannot be changed, only deleted. Even if a user changes their phone number, the user ID will remain unchanged, allowing that user to login to Telegram using the user ID. A user can change their public-facing username, but the user ID will remain the same.

15. WHOIS is a query and response protocol that is used for querying databases that store an Internet resource's registered users or assignees. These resources include domain names, IP address blocks, and autonomous systems. Registered users can register their domains themselves or through a third-party service, such as Namecheap, Inc. The domain registration process includes basic subscriber information, such as the email address of the registered agent that created and/or controls the domain.

## PROBABLE CAUSE

### *Overview of the Investigation*

16. I am part of an investigation into a group of cyber-criminal actors who refer to themselves as "the Com." As described in detail below, Treyton Daniel Aubuchon a/k/a ALOEL ("**AUBUCHON**") is a member of The Com and participated with other members of The Com in committing the **SUBJECT OFFENSES**. **AUBUCHON** is a 19-year-old male who was most recently located at **SUBJECT PREMISES** and who is believed to reside there. **MONZON** is 19-

year-old woman who is or was **AUBUCHON**'s girlfriend and there is probable cause to believe that she has assisted **AUBUCHON** in carrying out the schemes described herein. **MONZON** resides at **SUBJECT PREMISES.** On June 18, 2025, **AUBUCHON** was indicted in the Eastern District of Pennsylvania on one count of conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349, one count of wire fraud in violation of 18 U.S.C. § 1343, and one count of aggravated identity theft in violation of 18 U.S.C. § 1028A. As set forth below, there is probable cause to believe that evidence of the **SUBJECT OFFENSES** will be found at the **SUBJECT PREMISES.**

17. The Com consists of a geographically diverse group of individuals, including **AUBUCHON**, organized in various subgroups, all of whom coordinate through online communication applications such as Discord and Telegram to engage in various types of criminal activity to include corporate intrusions, SIM swapping, cryptocurrency theft, commissioning in real life violence, and swatting. Members of the Com, including **AUBUCHON**, have victimized (and continue to victimize) U.S.-based individuals, including by gaining unlawful access to sensitive account information in order to steal the victims' cryptocurrency.

18. In addition to the investigation into the Com, the FBI is also investigating an organization and online platform referred to as CryptoChameleon. CryptoChameleon employs phishing panels that are used by teams of individuals to unlawfully obtain cryptocurrency from its victims. Members of the Com are known to use the services, panels, and platform offered by CryptoChameleon to carry out their fraudulent schemes. Specifically, CryptoChameleon employs phishing panels that mimic the sign-on pages for cryptocurrency companies and exchanges, and other providers of online services, such as email providers. These phishing panels are used by teams of individuals to steal millions in cryptocurrency from victims throughout the United States.

As described below, **AUBUCHON** and other members of The Com use CryptoChameleon to help them steal cryptocurrency from their victims.

19. Within CryptoChameleon is a particular phishing panel (the "TARGET PHISHING PANEL"), which is operated by an individual who uses the moniker "PERM" a/k/a "Annie" (hereinafter, "PERM"). PERM uses Telegram, an end-to-end encrypted messaging application to further his operation of the TARGET PHISHING PANEL. One of PERM's primary Telegram accounts used to operate the TARGET PHISHING PANEL is Telegram unique user ID 5996166691 ("PERM TELEGRAM ACCOUNT 1"). Another of PERM's primary Telegram accounts used to operate the TARGET PHISHING PANEL is Telegram unique user ID 8036335251 ("PERM TELEGRAM ACCOUNT 2"). PERM generally provides access to the TARGET PHISHING PANEL to others for a one-time fee between approximately $1,000-$2,000 and approximately 10% of the proceeds of each successful phishing attack. When PERM grants access to a user for the TARGET PHISHING PANEL, the user is assigned a unique User ID and password. As described below, **AUBUCHON** had a unique UserID on the TARGET PHISHING PANEL and worked with other members of the Com and CryptoChameleon to steal cryptocurrency from victims using the TARGET PHISHING PANEL.

20. The investigation has shown that PERM is responsible for hundreds of spoofed domains (the "SPOOFED PANEL DOMAINS") meant to mimic the legitimate websites of cryptocurrency companies and exchanges, and other providers of online services. When a user is granted access to the TARGET PHISHING PANEL by PERM, PERM makes a specific subset of those domains available to that user, usually on an exclusive basis. Although the user will have exclusive access and use of numerous SPOOFED PANEL DOMAINS, the user is granted an

admin domain[2] from which they access the TARGET PHISHING PANEL. Once they have logged-in through their admin domain, the user can deploy any of their assigned SPOOFED PANEL DOMAINS to target victims.

21. Using a Telegram bot Application Programing Interface (API)[3] coded into the TARGET PHISHING PANEL, PERM is able to monitor both the users of the TARGET PHISHING PANEL and information about the victims. For example, should a user log into the TARGET PHISHING PANEL and access one of their assigned SPOOFED PANEL DOMAINS using their username and password, the Telegram bot ("PERM Notifiers") would send a message in a group chat to PERM and the user notifying them of the log-in. Similarly, the Telegram bot reports on other activities related to the TARGET PHISHING PANEL. For example, through the Telegram bot, PERM can monitor actions taken on the TARGET PHISHING PANEL, such as when a victim access one of the SPOOFED PANEL DOMAINS and the information the victim enters, such as their log-in credentials, personal identifying information, or seed phrases.

22. One of the users of the TARGET PHISHING PANEL had the username "aloel." Based upon my training and experience and the evidence gathered during this investigation, I believe that the "aloel" user was **AUBUCHON**. There is probable cause to believe **AUBUCHON** was involved in cryptocurrency thefts from at least 17 victims totaling at least $289,000 between September 2024 and March 2025, based on cryptocurrency prices on March 2025.

---

[2] A user's admin domain will generally incorporate the name of a virtual currency exchange, like Gemini or Coinbase. However, the user's assigned SPOOFED PANEL DOMAINS may incorporate a variety of virtual currency exchanges and other online providers.

[3] An Application Programming Interface (API) is a set of rules and protocols that allows different software applications to communicate and interact with each other, enabling them to share data, features, and functionalities. It acts as a bridge between two systems, allowing them to exchange information without exposing the internal workings of either.

***PERM's Operation of the TARGET PHISHING PANEL***

23. On September 12, 2024, a then-17-year-old, ("Person-1") was interviewed by the FBI in the presence of counsel. Person-1 stated to FBI agents that Person-1 knows, and regularly speaks with on Telegram, a person who goes by PERM, A/K/A ANNIE, A/K/A PERMBIGSIR. Person-1 stated that PERM created a phishing panel around August/September 2023. Person-1 stated that almost everyone on the internet who commits phishing attacks to steal cryptocurrency used PERM's panel. Person-1 stated that the panel is widely used due to its low cost (referring to PERM's fee) and the user-friendly interface. Person-1 stated that in order to gain access to PERM's panel, one must directly message PERM on Telegram with proof of experience stealing cryptocurrency (i.e., phishing experience), which is typically done by sending a screenshot of a cryptocurrency wallet containing a large amount of cryptocurrency. Person-1 stated that the cost or fee for utilizing the panel was approximately 10% of all earnings gained by using the panel. Person-1 stated that if a user of the panel was able to steal approximately $100,000-$150,000, the 10% fee starts to lower. Person-1 stated that users of the panel could negotiate the percentage based on how much money they were able to steal. Person-1 stated that previously, individuals could pay a one-time fee for access to the panel, but most pay the percentage. Person-1 stated that PERM was just an average scammer but became well known because PERM had cheaper "rates" or fees to use his panel.

24. Person-1 stated that PERM was the leader of the group called CryptoChameleon and used PERM TELEGRAM ACCOUNT 1 for communication. Person-1 stated that PERM's phishing panel—which I know to be the TARGET PHISHING PANEL—had built-in notifications where PERM would be notified anytime the TARGET PHISHING PANEL was used, what it was

used for, the IP address from which the panel was accessed, and the username that accessed the panel. Person-1 stated that when a user got access to the panel, PERM assigned a username to the new user if the user did not specifically ask for a username. Person-1 stated that each unique web page[4] of the TARGET PHISHING PANEL had a specific list of users assigned to it. For example, if PERM created the phishing domain 1234-coinbase.com (intended to mimic the legitimate site coinbase.com), a specific list of the TARGET PHISHING PANEL's users would be assigned to that phishing domain. Person-1 stated that PERM created a separate group chat on Telegram for all the users to communicate who were utilizing that unique panel page. Person-1 stated that PERM had 64 different Telegram group chats for the phishing panel.

25. Person-1 stated that PERM does all the back-end support and technical maintenance for the TARGET PHISHING PANEL and ensures the panel runs smoothly. Person-1 stated that PERM copies the web design of the phishing websites directly from the legitimate websites in order to increase the likelihood they fool the victims into thinking they are visiting a legitimate company's site. PERM has different panels that impersonate numerous services, including cryptocurrency companies such as Kraken, Coinbase, and Gemini, and email and phone providers including Gmail and Apple.

***The Theft from Victim 1***

26. On January 27, 2024, VICTIM 1 received a phone call impersonating an Apple employee. The callers induced VICTIM 1 to change the passcode on their Apple account and then gained access to VICTIM 1's financial information on their cellphone, including log on

[4] When Person-1 was referring to the unique web pages, he was referring to the SPOOFED PANEL DOMAINS.

information and seed phrases. Using this information, the conspirators stole approximately $886,172 in cryptocurrency from VICTIM 1. VICTIM 1's cryptocurrency was transferred to at least two cryptocurrency addresses: (1) bc1qp0ssu8scnsfc86nv58hk02s268yxj53hjy4cxn (the "p0ssu Address"), within an identified bitcoin cluster (the "p0ssu Cluster"); and (2) Ethereum address 0xD9b22e9DB4fc1fE6D0bf241b177119F58D7D03E7 (the "0xD9 Ethereum Address"). A review of the publicly available Telegram chat titled "FLIPD" (chat ID 1506270343) revealed that on May 7, 2024, PERM TELEGRAM ACCOUNT 1 claimed to control the 0xD9 Ethereum Address. On June 3, 2024, in the same Telegram chat, PERM claimed ownership of the z02et Address (one of the 152 addresses in the p0ssu Cluster).

***The Theft from Victim 2***

27. On April 6, 2024, a resident of the Eastern District of Pennsylvania ("Victim 2") received a text from phone number 706-452-1926, purportedly from Yahoo, stating that a phone number change had been made on his Yahoo account and to reply with "N" if it was unauthorized. Victim 1 responded, "N" to the text message. Victim 2 further advised that, shortly thereafter, on April 6, 2024, he received a call from 864-756-1142 (the "1142 number"). The caller claimed he was a representative from Coinbase and advised Victim 2 that his Coinbase account had been compromised.

28. On May 9, 2024, The Honorable Thomas Branca, Montgomery County (Pennsylvania) Court of Common Pleas, approved a search warrant for the 1142 Number. Responsive records from Google showed the Google Voice phone number was associated with the Google account phamvanhung6536tt@gmail.com. On October 28, 2024, The Honorable Wendy Rothstein, Montgomery County (Pennsylvania) Court of Common Pleas approved a search

warrant for the full account data associated with the phamvanhungtt6536tt@gmail.com account. A review of records received from Google revealed that the account only connected to one IP address that was not a VPN or proxy and that IP address was 2600:6c44:627f:5ee4:8df:f500:ba99:226c which resolved to Charter Communications (the "CC IP ADDRESS"). Records received from Charter Communications pursuant to legal process revealed that the subscriber for the CC IP ADDRESS is "G.S" with an address of **SUBJECT PREMISES.**[5] The Charter records also revealed that the account had a range of IP addresses assigned to it (the "CC IP Net Range").

29. The CC IP ADDRESS first connected to the phamvanhung6536tt@gmail.com account on March 18, 2024, and the date of last connection was April 14, 2024. On October 9, 2024, the Honorable Thomas Branca, Montgomery County (Pennsylvania) Court of Common Pleas, approved a search warrant for Charter Communications records for the CC IP ADDRESS that connected on March 18, 2024, at 0548 UTC.

30. During the call, Victim 2 also received a text message from 818-850-2627 (the "2627 Number")[6] that provided a link to a website "191284-Coinbase.com" which is one of SPOOFED PANEL DOMAINS.

31. Victim 2 could not recall whether he clicked on the link or entered his login credentials. He advised that his username and password were the same for both Yahoo and Coinbase. Victim 1 advised that during the phone call with the 1142 number, he was instructed to

---

[5] According to police reports received from the Berlin Police Department from 2022, G.S. is **MONZON's** grandmother who also resides at the **SUBJECT PREMISES.**

[6] The investigation revealed that the 2627 number was associated with another individual, CD1, who is discussed in detail below**.**

provide his Two Factor Authentication (2FA) code from Coinbase to facilitate a transfer to a secure wallet. Based on my training and experience, I know that Coinbase offers a security setting whereby Coinbase sends a 2FA challenge before authorizing a funds transfer. Believing the caller was from Coinbase, Victim 2 provided the codes as instructed. Victim 2 subsequently realized this was a scam and that his Coinbase account had been drained. At the time of the theft, Victim 2's funds were valued at approximately $60,682.57.

32. On May 9, 2024, a detective from the Towamencin police department applied for a Google search warrant for the 2627 Number and the 1142 number, which the Hon. Thomas Branca, Court of Common Pleas, Montgomery Count (Pennsylvania) authorized. Both the 2627 Number and the 1142 Number are Google voice numbers. A Google voice number works on smartphones, tablets, and computers and enables a user to place and receive calls over the internet without a cellular connection. Analysis of the responsive Google records revealed that between April 5 and May 3, 2024, the 2627 Number sent or received text messages to/from 23 unique phone numbers. Approximately 18 of the text messages contained phishing links or outgoing messages which appear to involve phishing attempts.

33. Likewise, the Google records showed that the 1142 number sent or received 45 text messages in April of 2024, of which nearly all appear to be phishing attempts by the user of the 1142 number. In addition, the 1142 number sent threatening messages to the putative victims of the phishing attempts. For example, on April 7, 2023, the 1142 number sent the following phishing text message to a number ending in 1723: "COINBASE: Secure your account - https://17915-coinbase.com/." 17915-coinbase.com is one of the SPOOFED PANEL DOMAINS. Approximately two minutes later, the 1142 number sent the 1723 number a residential address,

which I assess to be the residential address of the user of the 1723 number, followed by a text message stating "Dead in a week."

34. In addition, cryptocurrency blockchain tracing showed that Victim 2's stolen funds were subsequently transferred to several cryptocurrency exchange accounts, with the majority of funds being transferred through smart contracts and cryptocurrency mixing services. Additional analysis revealed that a portion of the stolen funds were deposited into a Stake.com account that had previously been funded by CD1 (discussed below) on 27 separate occasions. Based on my training and experience and open-source information, I know that Stake.com is a Curaçaoan cryptocurrency-based online casino operated by Medium Rare NV, a company incorporated in Curaçao that holds an online casino license. Based on information from CD1 and other witnesses, I also know that members of the Com frequently use Stake.com to launder their stolen proceeds.

***CD1's Information***

35. On August 19, 2024, a cooperating defendant ("CD1") was charged by complaint in the Eastern District of Pennsylvania with one count of violating 18 U.S.C. § 1343 in relation to a theft from Victim 2, further described below. CD1 is currently detained pending trial. The FBI has interviewed CD1 in the presence of his attorney pursuant to a proffer agreement on several occasions.[7] CD1 identified ALOEL as a member of the Com and a participant in the

[7] CD1 is providing information to law enforcement with the hope of receiving a benefit in his pending criminal case. Much of the information provided by CD1 has been proven reliable and corroborated through other investigative means.

cryptocurrency thefts using the TARGET PHISHING PANEL. Among other things, CD1 provided the following information:

a. Person-1 introduced CD1 to an individual referred to as "PERM." CD1 met Person-1 in 2022 on Discord. Person-1 told CD1 he made a lot of money through PERM. CD1 explained that PERM develops panels of login pages for various financial institutions or cryptocurrency exchanges. PERM provided individuals with a "panel" in exchange for a $2,000 first month fee, and an $800 subscription each month thereafter. PERM also received a fee of between 5% and 10% based on the amount of money stolen through the panel. If the amount was under $100,000, PERM would take a 10% fee; if more, a 5% fee. Once the initial $2,000 fee was paid, PERM created a private Telegram chat with the individual, himself, and a Telegram bot.

b. Once an individual was granted access to a panel, PERM required them to put everything regarding the panel in the Telegram chat that PERM created. PERM took payment of the fee based on the pictures posted in the Telegram chat showing the amounts in the financial accounts run through the panel. CD1 never paid PERM, other than the $2,000 fee, which was paid via Bitcoin. When CD1 gained access into a victim's account, PERM would request a screenshot of the account balance of the victim's cryptocurrency so that PERM could calculate the percentage owed to PERM. According to CD1, he would post screenshots of the victim's account balance in the Telegram chat, but he edited the amounts to show zero balances in

an effort to cheat PERM of the agreed-upon percentage owed for use of the phishing panel.

c. CD1 worked with others to steal cryptocurrency from victims. After stealing the funds, CD1 would usually "clean" his cut of the funds by converting Bitcoin to Monero (XMR) then into another cryptocurrency.

d. CD1, working with others, has successfully stolen cryptocurrency from approximately 20 victims. CD1 reported that at least two of his co-conspirators still had access to CD1's panel if it is still up. CD1's administrator panel was 191284-gemini.com, which is one of the SPOOFED PANEL DOMAINS.

e. CD1 explained that he and "ALOEL" did several jobs together, including thefts for approximately $50,000, $17,000 and $4,000. CD1 described ALOEL as having an American accent and living in the Eastern time zone. CD1 thought that ALOEL lived with his girlfriend. CD1 stated that he got ALOEL kicked off of the TARGET PHISHING PANEL because CD1 would not vouch for ALOEL. CD1 explained that he refused to vouch for ALOEL because he wanted ALOEL to continue to work for CD1 instead of having access to his own panel.

**AUBUCHON's USE OF THE TARGET PHISHING PANEL**

36. As noted above, based on various investigative techniques, including confidential human source reporting, open-source research, search warrants issued in the Western District of Virginia, and images of servers voluntarily provided by foreign hosting companies pursuant to a request from the FBI, law enforcement identified many of the SPOOFED PANEL DOMAINS and information about the TARGET PHISHING PANEL. A review of those materials revealed the

user information for the username "aloel" on the TARGET PHISHING PANEL (hereafter, "PANEL USER ALOEL") who was assigned the admin domain 125194-coinbase.com. Based upon my training and experience and the evidence gathered during this investigation, I believe that the PANEL USER ALOEL was operated by **AUBUCHON**. Review of data for PANEL USER ALOEL identified five (5) captured seed phrases from October 30, 2024, to November 18, 2024. As noted above, when the TARGET PHISHING PANEL is deployed against a victim, the user can trick the victim into providing their seed phrase which then allows the user to take control of the victim's funds. Blockchain analysis revealed that all 5 of the captured seed phrases resolved to public addresses that had connections to Coinbase. Records received from Coinbase pursuant to legal process revealed that all five Coinbase accounts associated with the 5 captured seed phrases had been victimized in the types of schemes outlined in this affidavit.

37. One of the seed phrases resolved to the crypto addresses 0x91E37B9Ee63d1Eb8E30ce23A61223C2b3190d346 ("VICTIM 3 ADDRESS"). Victim 3 submitted a report to the FBI Internet Crime Complaint Center ("IC3") report I2409291221249681 ("Victim 3"). Victim 3 detailed a crypto theft that occurred on September 27, 2024, that involved a loss of funds from VICTIM 3 ADDRESS. Blockchain analysis also revealed that the Stake account JoelTome69, further detailed below, received a portion of the stolen funds from Victim 3's September 27, 2024, loss.

**Identification of AUBUCHON as "ALOEL"**

38. A search warrant authorized by the Honorable Judge Pamala Sargeant in the Western District of Virginia on the PERM Notifiers revealed that Telegram UID 6314142781 (the

"ALOEL TELEGRAM ACCOUNT"), which, at the time, was associated with the username aloel, was communicating with PERM TELEGRAM ACCOUNT 2 in a similar manner as CD1.

39. Open-source research on the ALOEL TELEGRAM ACCOUNT revealed that it was associated with the following usernames: John Hamilton, John, Hamilton, and aloel. On March 11, 2025 at 23:57:42 UTC, in the Telegram channel Sim Land, Channel ID 2447022282, the ALOEL TELEGRAM ACCOUNT posted: "Hey guys its Johnathan Hamilton here, wanted to let you know im currently looking for callers. Thanks." Based on my training and experience and information gathered through this investigation, I know that the term "callers" refers to individuals involved in the frauds described herein who are responsible for placing calls to putative victims posing as, among other things, representatives of cryptocurrency exchanges, consistent with the frauds effectuated against Victim 1 and Victim 2.

40. On October 24, 2023, in the Telegram chat Star chat, Channel ID 1774693990, the ALOEL TELEGRAM ACCOUNT posted "bc1qcquvnftukhp7y529lq750kmtqlu07fy4gvn0v3" ("SUBJECT ADDRESS 1"). Based on my training, experience and information gathered through this investigation, I believe that the ALOEL TELEGRAM ACCOUNT was "flexing," which is an act of bravado where the poster invites other users to look up their cryptocurrency address. Because the blockchain is public, other users can research the cryptocurrency address and see how much value is associated with it. Based on my training, experience, and information gathered through this investigation, I believe that the ALOEL TELEGRAM ACCOUNT was likely showing off that he or she possessed significant funds, which can also build "reputation" with the community.[8]

[8] This is similar to PERM's requirement, discussed in paragraph 21, that users provide proof of experience stealing cryptocurrency, generally by sending a screenshot of a cryptocurrency wallet containing a large amount of cryptocurrency, which can be researched via the blockchain.

41. Also on October 24, 2023, the ALOEL TELEGRAM ACCOUNT sent a message to another conspirator over Telegram stating "yo" "ill call for 100 per" which I believe is ALOEL offering to act as a caller for another member of the conspiracy. In that conversation, ALOEL sent an attachment to the conspirator, which included the following in the message: "aloel SE Services Greatest SE to ever grace the earth|@aloel." Based on my training and experience and information gathered through this investigation, I know that "SE" refers to social engineering, a type of fraud scheme wherein individuals call a potential victim and "socially engineer" or trick them into providing passwords, pins, and other personal information that the callers use to gain unauthorized access to the victim's private accounts, including cryptocurrency accounts, email accounts, bank accounts, and other valuable personal files. The conspirator and ALOEL then exchanged information about a potential victim, sending a code, and then the conspirator told ALOEL that it "WORKED" and asked for a "btc" "ady" which I believe was the conspirator asking ALOEL for a bitcoin address to send his fee to for a successful theft. The conspirator then asked "is that ur" "gf" which I believe was the conspirator asking if a voice or an image that the conspirator heard or saw was ALOEL's girlfriend, to which ALOEL responded "wife" followed by SUBJECT ADDRESS 1 and "got married early im 18." Based on my training and experience, the context of the conversation, and information gathered through the investigation, I believe that ALOEL was referring to **MONZON** as his "wife." Notably, SUBJECT ADDRESS 1 transferred funds to the **MONZON** Venmo account discussed below.

42. A review of the Blockchain revealed that SUBJECT ADDRESS 1 had approximately $1,100 deposited into it from a BitStop Bitcoin ATM over eight (8) separate transactions between October 21, 2023, and November 6, 2023. Records received from BitStop

pursuant to legal process revealed the following registered individual and photographs of the individual depositing funds:

Name: Trey Aubuchon
Phone number: 920-314-3184
Date of Birth: May 25, 2005
Address: 343 E Park Avenue, Berlin, Wisconsin
Machine location: 247 Ripon Road, Berlin, Wisconsin




I compared the images captured by the BitStop ATM to **AUBUCHON's** Wisconsin driver's license and I believe they depict the same person.

43. A review of the Blockchain revealed that SUBJECT ADDRESS 1 received approximately $50 on November 6, 2023, from the p0ssu address. It also revealed that SUBJECT ADDRESS 1 sent funds from the online virtual currency exchange FixedFloat, and sent or received funds from the addresses bc1qsc8mmq30f9tt303nunx3c075fdfl34axl2llk7 ("SUBJECT ADDRESS 2") and bc1qlg35yzk4e5chcqnnqp47vew05dgn8cyh5n45hs ("SUBJECT ADDRESS 3").

44. Records received from FixedFloat revealed that the user connected to these transactions provided gloriariley19946@gmail.com (the "**GLORIA EMAIL ACCOUNT**") as the user's email account. FixedFloat also provided information for other transactions associated with the **GLORIA EMAIL ACCOUNT**. In total, the seven transactions associated with the **GLORIA EMAIL ACCOUNT** involved the exchange of $80,023.30. Another transaction conducted on FixedFloat by the **GLORIA EMAIL ACCOUNT** involved the sending of funds from 0x7C387232EC98c3720ba546583A93c0c0B697B06a ("SUBJECT ADDRESS 4"). A review of the Blockchain revealed that between April 28, 2024, and May 11, 2024, SUBJECT ADDRESS 4 sent approximately $2,400 to the 0xD9 Ethereum Address (attributed to PERM) over three transactions. Review of SUBJECT ADDRESS 1 and SUBJECT ADDRESS 4 transactions on the Blockchain also revealed deposits totaling approximately $318,000 to the Stake.com account with the username JoelTome69.

45. Records received from Stake.com pursuant to legal process provided the following subscriber information for the JoelTome69 account:

| | |
|---|---|
| First Name: | Ognen |
| Last Name: | Delov[9] |
| DOB: | 1/1/2004 |
| Address | Todor Panica 7, Skopje 1000, North Macedonia |
| Email: | gloriariley19946@gmail.com |
| Creation Date: | 6/4/2024 |
| Creation Time: | 6:54AM |
| Creation IP: | 178.249.209.185 |
| Username: | JoelTome69 |

[9] A North Macedonia identity card in the name of Ognen Delov was provided to Stake.com as part of the registration process for the JoelTome69 account. The individual depicted in that identity card is not **AUBUCHON.** Based on my training and experience, I know that Stake.com is unavailable in the U.S. and that members of the Com frequently provided false identification documents to use Stake.com's services. For example, Person-1 and CD1 both provided false identification documents to Stake.com for the accounts they used to launder funds.

46. Review of the deposits into the JoelTome69 Stake account (subscribed with the **GLORIA EMAIL ACCOUNT**) showed approximately $458,000 being deposited into the account and approximately $313,000 being withdrawn from the account in various cryptocurrencies, based on valuation on March 27, 2025.

47. Records received from ChangeNow pursuant to legal process revealed six transactions involving SUBJECT ADDRESS 1 occurring between November 10, 2023 and January 12, 2024. Two of those transactions were conducted on January 11, 2024, and January 12, 2024, and initiated from the CC IP Net Range.

48. A review of the blockchain revealed that the JoelTome69 Stake account was still receiving deposits as of March 31, 2025. Review of one such deposit on March 3, 2025, revealed that $1,500 originated from an individual ("VICTIM 4") who reported that their cryptocurrency wallet held at Coinbase had been compromised. Records received from Coinbase pursuant to legal process revealed that VICTIM 4 had reported to Coinbase that funds had been taken from their account and detailed an apparent fraudulent call impersonating Coinbase customer service.

**The GLORIA EMAIL ACCOUNT**

49. Records received from Google pursuant to legal process revealed that the **GLORIA EMAIL ACCOUNT** was created on November 20, 2014, with the name Jorge Olivera. The two-step verification phone number associated with the **GLORIA EMAIL ACCOUNT** is 920-314-3184, which is the same number used to register the BitStop Bitcoin ATM used by **AUBUCHON.** Review of the Google Pay information associated with the **GLORIA EMAIL ACCOUNT** revealed the postal address recipient names as Trey **AUBUCHON** and Micahila **MONZON.**

Review of the IP addresses used by the account revealed the CC IP Net Range, registered to **SUBJECT PREMISES.**

50. Records received from Google, LLC pursuant to legal process revealed that the **GLORIA EMAIL ACCOUNT** was often accessed from IP addresses resolving to various VPN services, such as Mulvad VPN. Three IP addresses that did not resolve to a known VPN, proxy or TOR service included the IP addresses 68.185.177.219, 2600:6c44:627f:5ee4:e12f:3b6:9ed9:6cf6, and 2600:6c46:5e00:1876:f531:7eae:81f8:dbf8. All three IP addresses resolved to Charter Communications in the state of Wisconsin. The IP address 2600:6c44:627f:5ee4:e12f:3b6:9ed9:6cf6 is within the CC IP Net Range subscribed to G.S. and was used to access the **GLORIA EMAIL ACCOUNT** on multiple different occasions between October 17, 2023 and September 23, 2024.

51. Records received from Google pursuant to a search warrant signed by the Honorable Magistrate Judge Craig Straw from the Eastern District of Pennsylvania for the **GLORIA EMAIL ACCOUNT**, revealed emails with various cryptocurrency, financial, and messaging services including, Stake.com, Coinbase, CashApp, PayPal, Gemini, KuCoin, Roobet, FixedFloat, Telegram, and Exodus. In addition, the **GLORIA EMAIL ACCOUNT** received emails from McLuck addressed to "Trey" and from SnapChat addressed to "trey.fucks." In addition, Roblox emailed the **GLORIA EMAIL ACCOUNT** a receipt with sales tax charged for Wisconsin sales tax. Emails from Kick addressed the **GLORIA EMAIL ACCOUNT** as "aloel." Emails from Duelbits and chess.com revealed the **GLORIA EMAIL ACCOUNT** was used to create accounts with those providers with the username "AloelSE." Likewise, emails from Twitch referred to AleolSE.

52. The Google records also revealed that a Personal Computer (PC) with the operating system Windows 10 was used to access the **GLORIA EMAIL ACCOUNT** on a Google Chrome web browser on January 1, 2025.

53. A review of the Google Drive records for the **GLORIA EMAIL ACCOUNT** revealed a cellphone screenshot of confirmations from Bitstop for transactions occurring on October 29, 2023, and November 5, 2023, which correlate to the known Bitstop transactions conducted by **AUBUCHON** discussed above. Also located on the Google Drive were lists of over 1,133 email addresses and phone numbers, similar to lists found on the devices belonging to CD1. Based on my training and experience and knowledge of this case, these appear to be lists of potential victims and associated personal identifying information saved in the **GLORIA EMAIL ACCOUNT** for future scams and fraudulent activity.

54. A review of the Google Voice for the **GLORIA EMAIL ACCOUNT** revealed dozens of text messages from Google Voice numbers with the same pattern of phishing activity described above with respect to VICTIM 2. For example, many of the Google voice text messages sent from the Google voice numbers associated with the **AUBUCHON EMAIL ACCOUNT** purport to be from Coinbase and provide a link for the victim to click on to validate transactions. Another message purports to be from Paypal. Other messages included what appears to be a victim's personal identifying information including, among other things, name, phone number, address, banking information, followed by a message that "I have ur addy youre sending 500 dollars now or youre dead on god nigga." Based on my knowledge of the actors within the Com, I know that they frequently threaten each other as shown in this message. Given the source of the threat, I believe this is AUBOCHON threatening another individual who has yet to be identified.

**The Theft from Victim 5**

55. On November 4, 2024, Victim 5, a resident of Mahwah, New Jersey, submitted an IC3 complaint, Victim 5 reported that they had received an automated call on October 28, 2024 that said there was suspicious activity on Victim 5's Coinbase account and to press one (1) if they had not logged in from Richmond, Virginia. Victim 5 pressed one and then received a call from someone identifying themselves as James from the Coinbase fraud unit. James said that Victim 5 needed to check an email they sent Victim 4 and follow a link to confirm or decline logins. Victim 5 followed a link that appeared to come from Coinbase.com Fraud/Security division and clicked decline. Then they gave Victim 5 general instructions on using wallets and Victim 5 proceeded to move all their assets to Coinbase wallet. James told Victim 5 that the transactions would take several days to become unhidden due to the security issues with the account. Victim 5 called Coinbase on November 4, 2024 and Coinbase confirmed that Victim 5 was a victim of fraud. Victim 5 reportedly lost approximately 0.48623366 BTC, 1.324408 ETH, and 18.77124215 LTC, worth approximately $49,459.24, based on cryptocurrency valuation at the time of the theft based on the transaction records provided.

56. Investigators traced the stolen funds from the wallet addresses provided by Victim 5. Among others, Victim 5's stolen funds were sent to bc1qek2s98eyptap5tgpv3ldssqdyvfytph47zp3kl ("SUBJECT ADDRESS 5") on October 28, 2024, and 0x63db265bf156b25f85841c8face02e915959ce9b ("SUBJECT ADDRESS 6") on October 30, 2024. SUBJECT ADDRESS 5 sent funds to the JoelTome69 Stake used by **AUBUCHON** account on October 29, 2024, and SUBJECT ADDRESS 6 sent funds to a PayPal deposit address on October 31, 2024 associated with **MONZON** as described below.

57. Records received from PayPal for the aforementioned deposit address revealed that PayPal account was subscribed to **MONZON** at **SUBJECT PREMISES** (the "**MONZON** PAYPAL ACCOUNT") and associated with the following information:

Name: Micahila Monzon
Street Address: 289 E Huron St, 1000, Berlin, WI 54923 ( **SUBJECT PREMISES)**
DOB: 13-Jul-2005
Mobile Phone: 1-920-420-7295
Mobile Phone: 1-608-686-4107
Email micahila.monzon@gmail.com

58. Between 2021 and 2025, the **MONZON PAYPAL ACCOUNT** was accessed from both web login and mobile logins. Based on my training and experience and information obtained through this investigation, there is probable cause to believe that **MONZON** has accessed and conducted transactions through the **MONZON PAYPAL ACCOUNT** through both a cellular device and a physical computer or tablet.

59. Records received from Paypal for the **MONZON PAYPAL ACCOUNT** revealed cryptocurrency deposits and withdrawals to addresses that sent funds to the Joel Tome69 Stake account used by **AUBUCHON** as well SUBJECT ADDRESS 6 and SUBJECT ADDRESS 1.

60. Between October 22, 2024, and January 7, 2025, the **MONZON PAYPAL ACCOUNT** received 46 transfers, totaling 1.01151473 Bitcoin ("BTC"), 41.80903291 Ethereum ("ETH"), and 141.27631474 Litecoin ("LTC"), valued at $237,004.81. Paypal records revealed that the **MONZON PAYPAL ACCOUNT** sent $188,684.11 in cryptocurrency, received $369,769 in cryptocurrency, sent $28,520 in USD, and received $211,428.66 in USD. Many of these receipts were traced back to victims of cryptocurrency thefts similar to the victims outlined in this affidavit. These addresses include SUBJECT ADDRESS 6,

bc1qs8fyztf3cwekl5pchfcnxph9t8qwkfrz0h6kcd (SUBJECT ADDRESS 7), and bc1q3nkx06rr2fe6hagmefqwpyamra29vtsjcnzyg2 (SUBJECT ADDRESS 8).

61. Review of the ALOEL username panel data revealed that a seed phrase captured in a similar manner to VICTIM 3 resolved to SUBJECT ADDRESS 7. On July 20, 2024, SUBJECT ADDRESS 8 received $55,000 from an address that investigators traced back to another Coinbase customer, likely another victim. Based on my training and experience and knowledge of this case, these transactions are indicative of stolen funds being sent to the **MONZON PAYPAL ACCOUNT**.

62. In addition, records received from Venmo revealed an account registered to **MONZON** at the **SUBJECT PREMISES.** The **MONZON** Venmo account was accessed throughout 2024 using an iPhone and had two mobile phone numbers registered with the account: 1-920-420-7295 and 1-608-686-4107. The **MONZON** Venmo account sent a total of $151,107.13, received a total of $9,761.45 and withdrew $78,040.50. A review of the IP addresses used by **MONZON** Venmo revealed the IP address 172.220.56.217, which is within the CC IP Net Range registered to **SUBJECT PREMISES**.

63. Neither **AUBUCHON** nor **MONZON** appear to have any sources of legitimate employment that would explain the large sums of money passing through their accounts. Based on my training and experience and information obtained through this investigation, I believe that **MONZON** is assisting **AUBUCHON** in laundering the stolen proceeds from the schemes described herein.

64. According to responsive records from Google LLC for the email address micahila.monzon@gmail.com (the "**MONZON EMAIL ACCOUNT"**) revealed the phone

number 920-420-7295 as the SMS recovery phone for the account. Additional review of the **MONZON EMAIL ACCOUNT** revealed IP addresses that resolved to the **SUBJECT PREMISES** and email headers from PayPal.

**AUBUCHON AND MONZON AND THE SUBJECT PREMISES**

65. Open-source research into the **SUBJECT PREMISES** revealed occupants as including **MONZON**. According to a Corporal from the Berlin Police Department, as of May 16, 2025, **AUBUCHON** still lives in Berlin, Wisconsin and was dating **MONZON.** Accordingly, AUBUCHON would likely have been at **SUBJECT PREMISES** often, including during the time when AUBUCHON was accessing the **GLORIA EMAIL ACCOUNT** and laundering victim funds. In addition, police reports from 2022 and 2023 identify **MONZON** as residing at **SUBJECT PREMISES 2** with **AUBUCHON** frequently present at the residence.

66. On June 17, 2025, an FBI agent conducting surveillance observed **MONZON** entering the **SUBJECT PREMISES** apartment building.

67. On July 2, 2025, local law enforcement in Berlin, Wisconsin responded to a domestic disturbance at the **SUBJECT PREMISES.** When they arrived, law enforcement identified **MONZON** and **AUBUCHON** within the **SUBJECT PREMISES.** Both **MONZON** and **AUBUCHON** were placed under arrest. Law enforcement observed a computer workspace and a cell phone believed to belong to **AUBUCHON** in the **SUBJECT PREMISES.**

68. Accordingly, based on the foregoing and on my training and experience, I believe that a search of **SUBJECT PREMISES,** and the person of **MONZON** will reveal electronic devices, such as personal computers and cell phones, used in the commission of the **SUBJECT OFFENSES**, including computers, mobile telephones, and hard drives or other storage media,

such as the personal computer and/or mobile devices used to access the **GLORIA EMAIL ACCOUNT,** the **ALOEL TELEGRAM ACCOUNT**, the **MONZON PAYPAL ACCOUNT,** the **MONZON VENMO ACCOUNT**, and other electronic devices used to deploy the TARGET PHISHING PANEL and to make calls and send texts to victims, as well as storage media, like hard wallets, to store cryptocurrency. I know that individuals involved in the schemes described herein require electronic devices to coordinate and commit their crimes. Due the complexity of the schemes, these crimes often require multiple members of the conspiracy to be working in tandem and, therefore, members of the conspiracy frequently require a consistent space, usually their homes, from which to operate their electronic devices without interruption or distraction. I further believe that records, data, and documents in the **SUBJECT PREMISES** and on the person of **MONZON** will contain evidence of the crimes under investigation, including but not limited to evidence of the communications between co-conspirators (both known and as of yet unknown), communications about the Target Phishing Panel and other tools used by **AUBUCHON** and **MONZON** to aid in cryptocurrency theft and related fraud, and financial accounts used to launder proceeds.

69. Because these crimes involved the use of the TARGET PHISHING PANEL, online platforms, cryptocurrency, Telegram and Discord, and email, the items to be seized could be stored almost anywhere within the **SUBJECT PREMISES** and on the person of **MONZON**, in both physical and electronic formats. Accordingly, I believe electronic evidence of the **SUBJECT OFFENSES** will be found at **SUBJECT PREMISES** and on the person of **MONZON**.

**<u>COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS</u>**

70. As described above and in Attachment B, this application seeks permission to search for records that might be found on the **SUBJECT PREMISES** and on the person of **MONZON**, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

71. *Probable cause*. I submit that if a computer or storage medium is found on the **SUBJECT PREMISES** and/or on the person of **MONZON**, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

72. *Forensic evidence*. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described in the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the **SUBJECT PREMISES** and/or on the person of **MONZON** because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of

peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some

information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.

Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f. In this case, the target of the investigation is believed to have been involved in cryptocurrency thefts and possibly other cybercriminal activities associated with The Com, such as obtaining information from protected computers without authorization, money laundering using cryptocurrency, and conspiracy to commit these types of offenses. All of these crimes generally require the use of computers and online services to research victims; communicate with victims, service providers, or co-conspirators; access protected computer networks without authorization; and store and process stolen cryptocurrency or data. For example, to access a victim's cryptocurrency account and steal cryptocurrency, a cybercriminal would need to connect to the network, generally through a computer connected to the internet. This type of theft is generally preceded by extensive online research about the target. Records of this reconnaissance can provide valuable evidence.

g. I know that when an individual uses a computer to obtain unauthorized access to a victim computer over the internet and/or steal cryptocurrency that was obtained through such unauthorized access, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The same is true for other cybercriminal activities, such as money laundering using cryptocurrency. The computer

is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

h. The offenses under investigation were conducted primarily from computers and/or other devices connected to the internet. Based on the investigation to date, as well as my training and experience concerning cybercrime more broadly, I am aware that cybercriminals commonly either conduct their crimes from their residences and/or use devices to conduct their crimes that they store in their residences or on their persons, where they can keep such devices (and the evidence contained on them) secure.

73. *Cryptocurrency evidence.* Attachment B seeks cryptocurrency addresses, cryptocurrency private keys, cryptocurrency root keys, PGP keys, and other encryption keys and passwords, as well as such information relating to digital currencies used by members of the computer fraud and extortion conspiracy under investigation. These pieces of data comprise long and complex character strings. In my training and experience, I know that many cryptocurrency and/or encryption users write down or otherwise record and store such items because they are too long to commit to memory. As such, these keys, passwords, and addresses may be documented in writing and secreted anywhere within a residence. Others store this information on computers, mobile phones, or electronic storage media (such as USB drives or cryptocurrency-specific storage devices such as Trezor devices). In my training and experience, many cybercriminals hide such

information and devices on their person or property for safekeeping. In numerous FBI investigations, agents have found these devices hidden in the walls, in ordinary household items (e.g., in a food storage container), or other unexpected places. Finally, because of the volatility of digital currency markets, many users keep digital currency applications on their cellular telephones, which allow them to access their accounts and transfer funds quickly in the event of a change in the markets or (for illicit users) law enforcement detection. For all of these reasons, I respectfully submit that probable cause exists to believe that such records, data, and documents will be found both within the **SUBJECT PREMISES** and on the person of **MONZON**, including in computers, external storage media, cellular telephones, or on other devices that store electronic data.

74. *Necessity of seizing or copying entire computers or storage media*. In most cases, a thorough search of premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time,

and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the **SUBJECT PREMISES**. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

75. *Nature of examination*. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted

scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## BIOMETRICS

76. The warrant I am applying for would also permit law enforcement to obtain from **AUBUCHON** and/or **MONZON** the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant. I seek this authority based on the following:

a. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. I know from my training and experience that some Samsung and some Apple devices have fingerprint scanners. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c. If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. I know from my training and experience that some Samsung and some Apple devices have facial recognition capabilities. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

d. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

e. As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

f. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours *and* the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

g. In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. As noted above, **MONZON** and **AUBUCHON** have been present at the **SUBJECT PREMISES** and are believed to store their electronic devices there. Thus, it will likely be necessary for law enforcement to have the ability to require **MONZON** to unlock the device using biometric features in the same manner as discussed above.

77. Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of **MONZON** to the fingerprint scanner of the device; (2) hold the device in front of the face of **MONZON** and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

78. Because several people share portions of the **SUBJECT PREMISES** as a residence, it is possible that the **SUBJECT PREMISES** will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

[intentionally left blank]

**ATTACHMENT A-1**

**Property to Be Searched**

This warrant applies to the residence located at 289 E Huron Street, Apt 1000, Berlin, Wisconsin (the SUBJECT PREMISES). THE SUBJECT PREMISES is a three story, brick, apartment building with a white entrance known as Historic Berlin School Apartments.



## ATTACHMENT B

**Property to be seized**

1. Evidence, instrumentalities, and fruits, whether in electronic or physical format, concerning violations of 18 U.S.C. § 1956 (money laundering), 18 U.S.C. § 371 (conspiracy), 18 U.S.C. § 1030 (computer fraud), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1349 (conspiracy to commit wire fraud), and 18 U.S.C. § 1028A (aggravated identity theft) (collectively, the "SUBJECT OFFENSES"), involving TREYTON DANIEL AUBUCHON, MICAHILA MONZON ("MONZON"), (collectively, the "SUBJECT PERSONS"), and other persons known and unknown, including:

a. Records, information, and evidence relating to the identification of persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the SUBJECT OFFENSES; or (ii) communicated about matters relating to the SUBJECT OFFENSES, including records that help reveal their whereabouts;

b. Records, information, and evidence of all communications, including call logs, text messages, encrypted messaging applications, audio messages, voice mails, as well as any messages in any internet messaging applications (i.e., "apps"), relating to planning, collaborating, conspiring, assisting (knowingly or unknowingly), executing, concealing, or covering up the commission of the SUBJECT OFFENSES, including records that help reveal their whereabouts;

c. Records, information, and evidence of any conspiracy, planning, or preparation to commit the SUBJECT OFFENSES;

d. Records, information, and evidence concerning the creation or use of email addresses, VOIP or Google voice numbers, and encrypted messaging applications related to the SUBJECT OFFENSES:

e. Records, information, and evidence concerning the identification and targeting of victims of the SUBJECT OFFENSES;

f. Records, information, communication, and evidence concerning the phishing, hacking, or taking over of accounts, including developing social engineering methods and practices for obtaining social media account credentials from a victim;

g. Records, information, communications, and evidence concerning the unauthorized access of, intrusion into, or compromise any victim social media account, including data obtained from a victim account without authorization;

h. Records, information, communications, and evidence concerning the unauthorized access of, intrusion into, or compromise, or data obtained from any account belonging to a person other than the SUBJECT PERSONS;

i. Records, information, communications, and evidence concerning access to login credentials for accounts, including communications about purported suspicious login attempts, security codes, passwords, or PINs;

j. Records, information, and evidence the transportation, transmission, or transfer of funds that are intended to be used to promote, conceal, or support unlawful activity relating to the SUBJECT OFFENSES and/or business email compromise schemes

k. Records, information, and evidence concerning any financial transactions and/or financial accounts, including but not limited banking and financial records, ledgers, wire transfer records, bank statements, cancelled checks, deposit slips, check registers, money orders, cashier's checks, account statements, including virtual currency transactions;

l. Records, information, communications, evidence, and electronic storage media concerning to any virtual currency, including information about virtual accounts, wallets, passcodes, private keys, public keys, account opening documents, statements, transactions, and correspondence;

m. Records, information, communications, and evidence concerning phishing panels, phishing calls or texts, or spoofed domains;

n. Documents, files, chats, keys, cryptocurrency symbols, and all records related to the usage, purchase, trading, and sale of cryptocurrency;

o. Driver's Licenses, social security cards, and any other identification documents or documents used for identification or to establish online accounts;

p. Photographs and videos relevant to the SUBJECT OFFENSES;

q. Physical and electronic documentation related to financial transactions, and operations, communication, interaction, or any such documentation that establishes the relationship among individuals active in the The Com or CryptoChameleon;

r. Evidence relating to what transpired at in-person meetings or telephone calls, including audio or video recordings of such meetings or calls and notes and summaries of such meetings or calls relating to the SUBJECT OFFENSES;

s. Evidence or records relating to the identification of any mail or Internet accounts, cryptocurrency accounts, bank accounts, telephone numbers, social media services, or web or mobile based applications providing Internet access, remote data storage, or communication services for any coconspirators;

t. The sources of income, and the location of, and identifiers for, bank accounts, virtual currency accounts, credit accounts, or other financial accounts relating to the SUBJECT OFFENSES;

u. Records, information, and evidence concerning to any digital payment processing company, such as PayPal, Venmo, Google Pay, or Apple Cash, including account opening documents, statements, and correspondence;

v. Records, information, communications, and evidence concerning creating, drafting, requesting, sending or receiving fraudulent documents, photographs, videos, or files used to further the SUBJECT OFFENSES;

w. Records and information relating to the use of other tools and techniques related to anonymizing online activities and avoiding detection or investigation by law enforcement, including the use of proxy services, virtual private network services, or of multiple online aliases and accounts;

x. Items relating to the use of cryptocurrency, including:

   i. Any and all representations of cryptocurrency public keys or addresses;

   ii. Any and all representations of cryptocurrency private keys;

   iii. Any and all representations of cryptocurrency wallets or their constitutive parts, to include "recovery seeds" or "root keys" which may be used to regenerate a wallet;

   iv. any and all software programs relating to the obtaining, use, and transacting in cryptocurrency;

   v. any and all communications or other records concerning the obtaining, use, and disposition of cryptocurrency;

   vi. Cryptocurrency hardware wallets or devices, such as Trezors.

2. For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry

entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c. evidence of the lack of such malicious software;

d. evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e. evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h. evidence of the times the COMPUTER was used;

i. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k. records of or information about Internet Protocol addresses used by the COMPUTER;

l. records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m. contextual information necessary to understand the evidence described in this attachment.

3. Routers, modems, and network equipment used to connect computers to the Internet.

The term "COMPUTER" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, cryptocurrency wallets, USBs, and other magnetic or optical media

During the execution of the search described in Attachment A-1 and A-2 law enforcement personnel are also specifically authorized to obtain from MONZON (but not any other individuals present at the time of execution of the warrant) the compelled display of any physical biometric characteristics (such as fingerprint/thumbprint, facial characteristics, or iris display) necessary to unlock any digital devices requiring such biometric access subject to seizure pursuant to this warrant for which law enforcement has reasonable suspicion that MONZON's physical biometric characteristics will unlock, to include pressing fingers or thumbs against and/or putting a face before the sensor, or any other security feature requiring biometric recognition of for the purpose of attempting to unlock the devices' security features in order to search the contents as authorized by this warrant.

While attempting to unlock the device by use of the compelled display of biometric characteristics pursuant to this warrant, law enforcement is not authorized to demand that the aforementioned person(s) state or otherwise provide the password or identify the specific biometric characteristics (including the unique finger(s) or other physical features), that may be used to unlock or access the devices. Nor does the warrant authorize law enforcement to use the fact that the warrant allows law enforcement to obtain the

display of any biometric characteristics to compel the aforementioned person(s) to state or otherwise provide that information. However, the voluntary disclosure of such information by the aforementioned person(s) is permitted. To avoid confusion on that point, if agents in executing the warrant ask MONZON for the password to the devices, or to identify which biometric characteristic (including the unique finger(s) or other physical features) unlocks the devices, the agents will not state or otherwise imply that the warrant requires MONZON to provide such information, and will make clear that providing any such information is voluntary and that MONZON is free to refuse the request.